In the Matter of CHICK SMITH FORD, INC., Debtor.

CHICK SMITH FORD, INC., Plaintiff,

v.

FORD MOTOR CREDIT COMPANY, Ford Motor Company, Inc., Defendant.

Bankruptcy No. 84–2426.
Adv. No. 84–515.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 9, 1985.

Larry M. Foyle, Tampa, Fla., for plaintiff.

Robert B. Glenn, Tampa, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER RE INJUNCTIVE RELIEF

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case, and the matter under consideration is the right of Chick Smith Ford, Inc., (Debtor) to the reliefs sought against Ford Motor Company, Inc., (FMC) and Ford Motor Credit Corporation (FMCrC).

The procedural posture of this matter is somewhat confusing because the Debtor filed two separate complaints on two separate dates in which it sought various and sundry reliefs, including injunctive reliefs. The reliefs sought in each of the Complaints are partially overlapping. In the

first, the relief sought is only against one of the Defendants and in the other, the relief sought is against both Defendants.

The first titled "Complaint for Turnover and Injunctive Relief" was filed on November 12, 1984 (Adversary No. 84–493) and named FMCrC as the sole defendant. In this Complaint the Debtor sought the following reliefs: 1) a mandatory injunction requiring FMCrC to turn over, to the Debtor, "the MSO's" i.e. the Manufacturer's Statement of Origin; 2) an order directing delivery of approximately 100 motor vehicles which are allegedly held by the Defendant; 3) an order directing that monies generated post-petition through installment contracts be paid over to the Debtor, or in the alternative, that they be applied to post-petition interest charges due to the Defendant; 4) an order awarding the Debtor damages, including the imposition of a fine for contempt as a result of the alleged willful violation of the automatic stay by the FMCrC.

On November 21, 1984 this Court issued a Temporary Restraining Order (TRO) and directed FMCrC to turn over all MSO's and titles held by FMCrC to vehicles which were in the inventory of the Debtor, both new and used, all of which were covered by the floor plan carried by FMCrC. It also ordered the Defendant to turnover titles to eight (8) used vehicles, vehicles which were not under the floor plan.

The TRO also directed the FMCrC to turnover to the Debtor all post-petition monies earned by the Debtor based on the difference between the contract rate and discount rate on retail installment contracts financed by FMCrC. The TRO also ordered the release of all retail contracts purchased by FMCrC, and scheduled a hearing to consider whether or not the Debtor should be entitled to any additional relief, either by way of injunction or otherwise.

On December 1, 1984 the Debtor filed a second Complaint. In this, the Debtor named both FMCrC and FMC as defendants, (Adversary No. 84–515). In this Complaint, the Debtor set forth two claims in separate counts. In Count I, it sought a preliminary and permanent injunction, mandatory in nature, in part requiring "Ford" (sic) to normalize the business relationship of the Debtor with FMC; 2) to compel FMC to continue to live up to the terms of its dealership agreement with the Debtor by timely shipping vehicles paid for; 3) to accept orders for parts and make timely delivery of parts; 4) to pay all monies to the Debtor, render an accounting in the future, and pay sums due to the Debtor on a regular basis; 5) to order FMC to cease all measures designed to destroy the Debtor's creditability with the customer and with the buying public. Although the Complaint named both FMC and FMCrC as defendants, the body of the Complaint refers to "Ford" without indicating which of the two defendants should comply if the Debtor is successful. The claim in Count II in the form of a turnover is based on § 542 of the Bankruptcy Code. In this Count the Debtor seeks a final judgment directing FMC to turn over to the Debtor all vehicles in transit, all prepaid parts and all monies owed to the Debtor as claimed by the Debtor. Thus, it appears that while FMCrC is named as Defendant in this adversary proceeding, the Debtor does not seek, directly, any relief against FMCrC.

On the same date that the Debtor filed its second Complaint, it also filed a Motion for Temporary Restraining Order based on the verified Complaint in which it sought the identical relief which it sought in the Complaint. On December 1, 1984, this Court granted the Motion and issued a Temporary Restraining Order only for the purpose of preserving the status quo. The Order did not grant the relief to the extent it was sought by the Debtor and the TRO merely ordered both Defendants to account for and to deliver all monies and properties which were claimed to be due and owing to the Debtor; ordered both Defendants to make deliveries to the Debtor of all vehicles which were in transit or at the "railhead" or at pre-delivery centers. The TRO also ordered "all parties", (sic) which apparently meant to include the Debtor that

to the extent there is a bona fide dispute between the parties, they are to furnish all documents and all other "support" (sic) evidence to substantiate their respective positions.

The TRO also scheduled an evidentiary hearing to consider whether to issue a permanent injunction or, in the alternative, to dissolve the TRO. As noted above, the relief sought by the Debtor in Adversary Proceeding No. 84–515 was presented in different forms, some legal and some equitable in nature. For instance, some sought, albeit not very well articulated, relief basically in the nature of mandatory injunction to compel specific performance of a dealership franchise agreement; some sought by way of injunction, to collect monies allegedly due and owing by the Debtor, accrued not since the commencement of the case, but also allegedly due and owing for warranty work performed prior to the commencement of the case.

In light of the statement of Counsel for the Debtor, that the Debtor is now willing to dismiss Adversary No. 84–493, that is, the first Complaint filed by the Debtor provided it has an opportunity to amend its second Complaint, Adversary Proceeding No. 84–515, the initial inquiry must be addressed to the question of whether or not injunctive relief is available as a procedural device to collect monies claimed to be due and owing to the party seeking the relief, which is the foremost interest, and the primary aim of the Debtor.

Considering this proposition first, it is well to point out that it cannot be gainsaid that injunctive relief is basically equitable in nature and, as such, is governed by equitable principles. It is true that equity will, at times, restore the status quo ante pending the ultimate resolution of the controversy, even before the Defendant has an opportunity to file a responsive pleading to a claim asserted by the Plaintiff. *In re Lennon*, 166 U.S. 548, 17 Sup.Ct. 658, 41 L.Ed. 1110 (1897). However, the remedy is not granted except under very extraordinary circumstances.

As stated by Judge Learned Hand in the case of *Sims v. Stuart*, 291 Fed. 707 (SDNY 1922), "Under the guise of a mandatory injunction I do not see how I can give final relief in advance of answer and trial in such a case. It is, of course, true that equity will at times affirmatively restore the status quo ante pending the suit (cites omitted). But never, so far as I know, will it take jurisdiction over a legal claim merely to hurry it along by granting final relief at the outset of the cause. . . ." Illustrative of this principle is the case of *Schlosser v. Commonwealth Edison Company*, 250 F.2d 478 (7th Cir.1958) which involved a claim by a retired employee of a defendant who is ordered to pay him forthwith the monies claimed to be due and owing. In support of this proposition, the Plaintiff alleged that he might die before the controversy is resolved. The Court of Appeals for the Seventh Circuit, speaking through Judge Major, recognized that the Plaintiff did allege that he might suffer irreparable harm unless he was able to obtain the preliminary injunction, but in rejecting the claim for injunctive relief, the Court held that the allegations of the Plaintiff, even if proven, were insufficient as a matter of law to warrant issuance of an injunction.

In a series of cases involving a franchise dispute, *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137 (3rd Cir. 1982), the Court of Appeals for the Third Circuit held that a preliminary injunction which ordered the payment of monies to the Plaintiffs when the underlying contract is disputed, misconceived the equitable nature of the relief sought and the very purpose of a proceeding to obtain injunctive relief. The Court of Appeals noted that "the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between .. competing claims." citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), but held that the courts never recognized the right to an injunction when the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law, citing *Glasco v. Hills*, 558

F.2d 179 (3rd Cir.1977); *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515 (3rd Cir.1976). See also *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C.Cir.1969).

Thus, it appears that the courts generally have been in agreement that it is improper to grant injunctive relief which requires the payment of monies in advance of the resolution of the underlying controversy on its merits, which involves the very right to the monies claimed.

This Court is not oblivious that there is one exception to the foregoing and it is true that in limited instances the courts did grant injunctive relief which involved payment of monies, but only in instances when the relief sought to recover the monies was merely an incidental part of the overall equitable relief sought. *Federal Leasing, Inc. v. Underwriters at Lloyd's*, 487 F.Supp. 1248 (D.Md.1980); *Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers*, 320 F.Supp. 389 (SDNY 1970). Other cases in which the courts upheld the right to collect monies by way of injunction involve payment of monies not to the Plaintiffs, but to governmental agencies in order to enforce various federal statutes and governmental policies. In re *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3rd Cir.1979).

The Debtor places a great reliance on § 542(b) of the Code which, inter alia, provides that an entity that owes a debt that is "property of the estate" and that has "... *matured, payable on demand or payable on Order, shall pay such debt to or on the order of the Trustee, ...*" In reliance of this provision of the Code, the Debtor suggests that this section created a separate statutory remedy by Congress and, therefore, a Debtor is entitled to a turnover by way of mandatory injunction, if necessary, to collect debts owed to the estate. In support of this proposition, the Debtor cites the cases of *In re Archer*, 34 B.R. 28 (Bankr.N.D.Tex.1983); *Commerce Union Bank v. Welch (In re Welch)*, 29 B.R. 819 (Bankr.M.D.Tenn.1982); *Waldschmidt v. Columbia Gulf Transmission Co. (In re Fulghum Construction Co.)*, 23 B.R. 147 (Bankr.M.D.Tenn.1982); *U.S. v. Perry (In re Perry)*, 26 B.R. 599 (Bankr.E.D.Pa.1983); and *Bridgeport Co., Inc. v. U.S. Postal Service (In re Bridgeport Company, Inc.)*, 39 B.R. 118 (Bankr.E.D.Ark.1984).

■ The proposition urged by the Debtor misses the mark. There is no doubt that Congress enacting § 542 contemplated a turnover to the estate of properties primarily tangible properties and monies which were due to the estate without dispute which are fully matured and payable on demand. *See, In re Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). It is clear that what Congress intended was to facilitate the administration of the estates, especially estates in reorganization cases by permitting a Debtor to obtain funds immediately necessary for survival; funds which were not in dispute, but which were only subject to a possible setoff under § 553 of the Code. E.g. *In re Archer, supra; In re Welch, supra*, both of which involved deposits in banks where the Debtor had an outstanding loan and the only question was to what extent the banks had the right to setoff their respective claims against the funds on deposit.

■ However, to extend the proposition urged by the Debtor would mean that a Debtor may collect, by way of mandatory injunction, disputed claims to monies, claims based strictly on state law which are unliquidated and contingent. Certainly such procedure could not be sanctioned outside bankruptcy and there is no just reason why it should be sanctioned just because the entity seeking to collect disputed funds happens to be a Debtor under the Bankruptcy Code. To approve the proposition urged by the Debtor would be without a doubt, a gross violation of the most basic concepts of due process to which every Defendant is entitled, which involves at least the right to enjoy all the procedural safeguards otherwise available to all litigants in civil litigation.

■ This leaves for consideration what relief, if any, can be granted at this time to

the Debtor. It is without serious dispute that the Debtor has a valid outstanding Dealership Agreement with FMC and an outstanding floor plan arrangement for FMCrC. Under these contracts, the Debtor has specific rights and, of course, also corresponding responsibilities. The rights based on these contracts are entitled and deserve judicial protection. These contracts are executory in nature and until they are rejected, they are deemed to be valid and binding on both parties. This is a Chapter 11 case and the time limitations placed on the trustee by § 365(d)(1) is not applicable; thus, unless there is a time fixed by the Court directing a Debtor to assume this particular contract, the Debtor may assume this contract any time before the confirmation of the Plan. See § 365(d)(2). This being the case, until the contract in question is rejected or validly terminated by either of the Defendants, the Debtor is entitled to compel specific performance and require the Defendants to abide by the provisions of the contracts.

 It is well established that the right to obtain specific performance of contract is recognized in equity *Chaney v. Brown*, 158 Fla. 489, 29 So.2d 209 (1947). The purpose of the remedy is to assure that the party who seeks it has full enjoyment of the benefit of his contract and a decree for specific performance is nothing more nor less than a means to compel a party to do precisely what he ought to have done without being coerced by the Court. *71 Am.Jr.2d, Specific Performance, § 1.* It is equally true, however, that specific performance will not be granted where under the circumstance an action at law for compensatory damages for the defendant's breach would be adequate to afford complete justice between the parties. *Taylor v. Florida E.C.R., Co.*, 54 Fla. 635, 45 So. 574 (1907); *Ray Richardson, Inc. v. Carlton*, 140 Fla. 229, 191 So. 433 (1939); *American Surety Co. v. Murphy*, 152 Fla. 862, 13 So.2d 442 (1943); *Biscayne Associates, Inc. v. Carson*, 104 So.2d 871 (3d DCA 1958).

It needs no elaborate discussion to point out the peculiar character of the contractual relationship of the Debtor with the Defendants. It is a Ford automobile dealership. It is obvious that the Debtor cannot obtain Ford automobiles from anyone except Ford Motor Company. Without its ability to carry on the business as a Ford dealership, the going concern value of its business and its good will will be destroyed and no remedy at law would adequately compensate the Debtor for this loss. The floor plan currently carried by FMCrC, theoretically, could be replaced by another financing institution, but, as a matter of practicality, this is not possible because of the close tie between the manufacturing arm of Ford Motor and its financing arm, Ford Motor Credit.

Based on the foregoing, it is clear that there is no way to assure that the Debtor is able to enjoy the fruits of its bargain unless the Defendants are ordered to comply with the terms of the contract and specifically perform its provisions, especially as they relate to honoring orders for parts, orders for automobiles, honoring warranty work performed by the Debtor and in the event disputes arise concerning the validity of the warranty work, follow the contract provisions to resolve such disputes. Moreover, it is proper to order Ford not to unreasonably withhold payments for warranty work. This relief shall apply at this time prospectively only with the proviso, however, that all warranty work performed in the past which is yet to be paid shall be settled in accordance with the terms of the contract and paid to the Debtor to the extent they are ultimately established to be valid.

An Order implementing the terms of this Memorandum Opinion shall be submitted by counsel for FMC. A separate Final Judgment shall be entered in favor of FMCrC and against the Debtor and dismissing the Complaint with prejudice, inasmuch as the Complaint fails to seek any relief or state any cause of action for which relief can be granted in the Complaint.